Mr. Young for the appellant, Mr. Hart for the appellant, Ms. Kelly for the appellant. Brian Young May it please the Court, my name is Brian Young and I represent the appellant, Brian Bryant. I would like to reserve one minute of my time for rebuttal. The judgment of the District Court against Brian Bryant should be reversed for two reasons. The District Court should have granted a mistrial for IRS Special Agent LaRose's improper testimony. And two, the District Court calculated the loss amount at sentencing in an arbitrary manner that overstated Brian Bryant's role in the alleged conspiracy. This Court has repeatedly made clear that non-expert summary and overview testimony presents obvious and pervasive dangers and that such testimony should be closely examined. Each of the dangers arose in Agent LaRose's testimony and his First, Agent LaRose's testimony served as additional evidence or as corroborative of the truth of the underlying testimony and evidence. He usurped the role of the jury by offering conclusions on disputed issues of fact. First, he testified that Brian Bryant controlled bank accounts that were not in Brian Bryant's name. He testified that checks were fraudulent and account balances consisted of proceeds of fraudulently obtained treasury checks. Third, he testified that certain signatures were purported while others were as they appeared to be, even though he was not a handwriting expert. Additionally, LaRose facilitated the subtle introduction of hearsay testimony. What LaRose knew and testified concerning Chyna Watkins' bank account was necessarily derived from her out-of-court witness statement. LaRose did the same for purported victim Vincent Short, who had not testified before LaRose was on the scene. Nevertheless, Agent LaRose testified that returns completed in Short's name were fraudulent. The third danger that this Court has identified as being problematic with non-expert summary and overview testimony is that it gives the government an additional closing argument. And LaRose's testimony was an additional... I am somewhat confused about what LaRose's status was. Was he a summary witness? Your Honor, he was both a summary witness and an overview witness. A summary witness in that he did to some extent testify about witnesses who had already testified, but he also was an overview witness in that he testified for Chyna Watkins and Vincent Short, even though they had not testified. Well, if he was a summary witness, how do you explain the judge's admonition that he should only testify about what he learned in the investigation and not what he heard during the trial? Your Honor, I don't recall on the record exactly when that admonition was given, but I think the problem... It was on page – it was on the first day of trial, I think, or the seventh, at page 149 to 150. Yes, Your Honor. My recollection is, though, he had already given the problematic testimony before that particular admonition was given. And so he had already testified about Chyna Watkins, for example, that Brian Bryant controlled her bank account, and then the admonition was given. So the problematic aspects of his testimony were already before the jury. And what I'm leading up to is that if he's not a summary witness in the sense that the IRS puts – not the IRS, but the Department of Justice Tax Division puts these – the IRS special agents and has them seated at counsel table during the whole trial, and they're the last witness the government usually calls. But if he's not a summary witness, then what was the basis for allowing him to be an exception to the witness rule? The basis for him being allowed to sit in the courtroom is – I know that it was objected to. I – in the record itself, I don't think that there was – I don't... But you haven't raised that on appeal. No, Your Honor. Not that particular aspect of his testimony. But to Your Honor's point is that he was both an overview witness and a summary witness, and I don't think that the nature of his testimony or his role in the trial really became clear until, again, he testified on the seventh, eighth, and ninth day of trial towards the close of the case. And towards the close of the case, he offered an additional closing argument for the government, which this Court has said is a particularly inherent danger of this kind of witness. LaRose went through each count of the indictment and shared his opinion, essentially that Brian Bryant was guilty of each of the charged counts. In other words, as this – as this Court has said before, in other cases, an experienced law enforcement agent has looked at the case and made a decision that Bryant was guilty and conveyed to the jury that they should do the same. How does his testimony in that regard differ from the testimony of – that was at issue in Lemire? The testimony in Lemire was – in this particular case, Lemire – what – what Agent LaRose did was go through each count in the indictment at the – at the very end before the close of the case and explain and – and basically say that – that why Brian Bryant was guilty. In Lemire, my – my recollection is the trial court decided that his testimony, the IRS agents or the agents who was actually testifying as to how cash flows went through certain offshore accounts, was merely consistent with the underlying evidence. And so there was no harm, I think, was the analysis – analysis in Lemire. So I think that the particular point here is that LaRose was making a closing argument for the government. And that particular – that particular aspect of the expert was not really addressed in a very thorough fashion because the court said that there was no harm because the underlying evidence was consistent with the expert's testimony. And the district court, in analyzing whether or not LaRose had made an additional closing argument, said that, well, no one would make a closing argument out of this. But that's not really the point. The point is whether or not LaRose added to the government's closing argument, whether or not LaRose himself was making the argument that should be made by counsel, that this court and more said is the problematic aspect of the expert testimony because it gives the government an extra closing argument. The agent is not testifying or summarizing underlying documents but make – basically making argument of counsel. Even if this court were determined there was no abuse of discretion with respect to LaRose's summary testimony or that any error was harmless, then the case should still be remanded for re-sentencing. The loss calculation method was arbitrary and the resulting loss amount overstated Bryant's participation in the alleged conspiracy. The only loss supported by the evidence was the amount of gain. At sentencing, the government proposed and the district court accepted without meaningful comment or scrutiny that the loss amount was $650,000, $3.06. Now, the loss amount is a reflection of the government's effort to saddle Bryant with more than the gain amount for the amount in the counsel's name. But less than the total amount of losses, which was $1.75 million. The issue is that the method the government used to calculate losses for Bryant is unsupported in the record and built on inferences and assumptions that are incapable of being understood in a review. It's unclear to me if I'm out of time. You are. The clock's going up. Yeah, it goes down and then your time's up and then it starts going up. I apologize. No worries, no worries. It can be confusing. We'll give you some time on rebuttal. Okay, thank you so much. If it please the court, my name is Dennis Hart. I'm here this morning on behalf of Ta'Kara Cooper. I'd like to concentrate my focus on the search and seizure question raised in our brief, with the court's permission. We begin with the proposition that a statement given by a defendant in order to be admissible must be the product of a free and unconstrained choice of its maker. That cannot be said of Mr. Ta'Kara Cooper's statements introduced at her trial. Yes, we agree there were no handcuffs. Yes, we agree there was no bright, shiny lights in her face. Yes, we agree the guns were not drawn, but that simplistic view, I think, must be rejected for a more detailed analysis of what went on, I think, as December 1st raid of Mrs. Cooper's house. It was a police-dominated atmosphere in her house that morning, that early morning. I tried to count the officers involved. One time, I think we said in our brief there were 12, but I think there were even more than that. Perhaps those outside, there were MPD officers present also. So there were at least 12 officers in her apartment. I think it's critical to understand that the agents in this case did not allow her to leave her house. And while it may have been done in her home, while it may have been done under circumstances that IRS agents should have thought were comfortable, that cannot be said of Ms. Cooper's state of mind at that time. When you say they did not allow her to leave the house, are you talking about the rides at school? Yes. Okay. Yes. I'd like to argue that the atmosphere was dominating from the very start, but all I have are the spare facts that Agent Schick demonstrated in the hearing. Isn't that true of every search warrant? Whenever a search warrant is executed in a home, the obligation of the occupant is to stand aside. And in that respect, it's not custody necessarily, because if it were, then every statement given by the occupant of the home during the execution of the search warrant would be excluded because it's not given with Miranda warnings. So how do you distinguish this particular situation from the run-of-the-mill execution of a search warrant? The school trip. The school trip. Yes, Your Honor. And the government's response to that is that we have a policy that whenever anybody leaves premises that are being searched, they can't reenter until the search is completed. That's Agent Schick's policy. So what's your answer to that? She didn't have to come back. She didn't have to come back. Ms. Cooper did not have to return to the house. Did she ask to not go back to the home? No, she wasn't given that alternative. She was told that if she wanted to take her daughter to school that morning, the agents had to take her and her daughter in the police car. Or else she couldn't get back into the house? No. That option was not given to her. She was told if she wanted to take her daughter to school that morning, she had to be in the custody of the IRS agents all the time. Is it established that they told her they must go with her or that they offered to go with her? No, it wasn't an offer. It seems like there's some facts that are not established below. Well, yes. It is not entirely clear, but my concrete impression is that she could only go with the IRS agents. So your concrete impression, but, I mean, doesn't the defendant here bear the burden of proof to show that she was in custody in this context? Yes, I suppose she does. I mean, it's your suppression motion, so I would think that's right. Yes. And I think we do that with the school trip. But we don't know exactly what happened or what was said. No, and that's the result of the government's presentation at trial and in the motion hearing. But if the defendant bears the burden of proof. I see what your honor says, yes. But I think we can reach that conclusion from the facts presented. There may be missing parts. How can we reach that? I mean, suppose the dialogue went something like this. It went, oh, I'm, you know, first of all, the interview starts out and she's told it's voluntary. And then she says, at some point, I need to get my daughter to school. And if the officer said, oh, sure, that's fine, would it be okay if we went along with you? And she says, I know that you don't believe that that's what happened, but we don't have the facts to know what, in fact, did. And if that were the dialogue and she just said, sure, well, I don't think from those facts we'd necessarily, would you be making the argument that she was in custody by virtue of? Well, based on those facts, I'd hate to commit myself. But your honor's right. If she said, is it okay if we go with you, then my argument would be much diminished. What do you do with the fact that after the search was finished, the police left? They didn't take her into custody. They didn't arrest her? I don't think that. They left her alone. Yes, I don't think that's dispositive of the conditions of custody during her questioning. No, but it's certainly powerful evidence that she wasn't in custody while the search was. Custody within the meaning of Miranda. I disagree on that. I think the meaning of custody is a significant limitation on your freedom, and when the officers told her she could only take her daughter to go to school in their custody. Well, a search is a significant intrusion on your freedom, too. Yes, it is. You have to stand aside. If they want to go into the bedroom, you want to go into the bedroom while they're searching the bedroom. You can't do it. That's correct, your honor. I see that my time has expired, and we'll submit on the rest of the issues. Thank you. You still have a minute, but that's fine. We'll get it to you in rebuttal. Good morning, your honors. May it please the court. Catherine Kelly on behalf of the United States. If I may, I'll just start with the suppression motion first. Your honor, in this case, it's not the evidence that is in the record that Ms. Cooper was told that if she wanted to take her daughter to school, that she must go in the agent's car and be driven and then be taken back to her home. That's simply not in the record. At most all agents, she was not able to recall a number of the specifics about what was said during the time at Ms. Cooper's house, mainly because it had been over six years since the time of the search warrant execution. However, what was – May I – did she have an automobile? Did Ms. Cooper have an automobile? That was not ever addressed in the record, your honor. I'm not sure. How old was the daughter? The daughter was either six or seven years old. What? The daughter was around six or seven years old. The indication in the record is that there is no evidence that she could only take the child to school if she was driven by the agents. There's no evidence that she was forced into the car for interview purposes either. And there's no evidence that indicates that the trip to school was done in any way to coerce statements from Ms. Cooper. Agent Schick testified that the reason for accompanying Ms. Cooper to school was due to agent safety along the lines of the fact that if you allow somebody to leave the premises where a search warrant is being executed, then if they leave on their own, they cannot come back to the premises until the search is finished. For agent safety, simply because you just don't know where the person goes after that or what they might be doing, if they've spoken to other people, if they've obtained a weapon, and so forth. So ultimately here, the drive to school does not change the fact that there was no custody going on during this search warrant in the first place. But why does it even matter what the purpose of the accompaniment was if – that's not an issue when we're trying to decide whether or not there was something in custody, right? It's not necessarily what the – I believe it is really in this case because it's really the question about the ride is whether or not that had some coercive effect on Ms. Cooper in – But if none of it's communicated to her. In other words, I mean, the officers may have an impression in their mind about why they feel they need to accompany her. Correct. But if none of it's communicated to her, then what does any of this matter? And we just don't know whether it was communicated to her, right? The officer testified that he didn't – couldn't recall whether anything was communicated to her. Right. The officer couldn't recall whether or not anything was communicated to her along those lines. But my point is ultimately there's no evidence that she was told, if you don't get in the car with us, then you're stuck, you can't come back to your house. Or that there's no evidence that driving the daughter to school was in some manner coercive of her later statements or even anything. In addition to that, there is an indication, particularly in the trial record, that Ms. Cooper had stated that she wanted to stop the interview when a break was necessary to take her daughter to school. That, in the government's mind, indicates that Cooper had exerted some control over the interview. She's saying in some respects that she wants to stop the interview because her daughter is going to be late for school. It indicates that she wasn't being unduly cowed by the agents, even though they were in her home. And Your Honor is correct in saying the search warrant executions, even though they are inherently police-dominated, that does not mean that they're coercive or create custodial situations for Miranda purposes. We cited the Perron decision from the Eighth Circuit for that point. And for those reasons, and given the other factors that are not here, as Defense Counsel has stated, there was no lights in her face, no one yelled at her, there were no guns drawn and so forth. So the overall interview situation was not coercive either. And notably, it was done in her home as well. And turning to Mr. Brian Bryant's claims, the summary witness, Agent LaRose here, did exactly as a non-expert summary witness is supposed to do. He helped the jury analyze and evaluate and organize a variety of factually complex evidence that came in fragmentally through a number of witnesses throughout trial. And the court, although they've noticed obvious dangers in regard to summary witness testimony, those dangers were simply not present here. He was not an overview witness, Your Honor. In this case, he was presented before trial and during trial as a summary witness. The court gave the instruction. What do you mean then? What's the distinction between an overview and a summary? Your Honors, in the Moore case, you were distinguishing the overview witness as somebody, usually a government agent who testifies at the beginning of trial about what you were going to hear during the trial about investigatory techniques that are used. Often, this court had found that sort of overview testimony problematic because they were, the overview witness ended up talking about testimony that never came in later in trial and so forth, and often was talking about inadmissible evidence that came as part of their investigation but was never part of the trial evidence. So this court does not allow overview witnesses. I'm sorry. I'm sorry, Your Honor. I'm finished with that. If he's a summary witness, then how do you account for the, was the 7th of February the first day of trial? No, the 7th of February was the first day that Agent LaRose testified and his testimony continued on to the 8th. How do you account for the admonition the court gave at page 149 of the transcript of that day, saying it would be preferable if you could limit your testimony to what you learned in your investigation? If I'm recalling that correctly, Your Honor, at that point, Agent LaRose had almost testified in regard to Takara Cooper, not Brian Bryant, that, yes, that's correct, that he was about to testify something along the lines that she had an agreement with Antonio Cooper regarding receiving tax refund checks at her home. And at that point, the court stopped Agent LaRose and did not allow him to testify in that regard. Read the, are you looking at the transcript now? I am, Your Honor. Okay, at the bottom of 149 to the top of 150. You need to explain to the courts, to Epstein and LaRose, you need to explain where you're getting your information from, and then you can speak to your information. But I think it has to be, I think, information you have received elsewhere instead of here. My understanding, and I did find that strange as I was reading the transcript as well, Your Honor, but my understanding of it ultimately was that the court was stopping them and stopping Agent LaRose and essentially telling him to stick to what he's learned from his review of the documents, not testimony that he's heard in trial. And again, it was a situation where he was a summary witness only with respect to the charts then, is that what you're saying? No, I mean, certainly a summary witness can testify more broadly to, in certain times to, as Agent LaRose did here, to kind of guide the jury as to what he's about to speak to next and so forth. My understanding of what the court was really saying is that for this part, don't be making conclusions like there was an agreement between Takara Cooper and Antonio Cooper about receiving the checks. That's not what he's supposed to do because that, of course, whether or not there was an agreement, is a jury question. Why was he needed in this case to testify about what government witnesses had to say? What he was doing in this case was usually guiding the jury to what the next topic was, for instance, because we had a huge number of witnesses in this case and then a number, just a vast number of documents, a huge number of bank accounts were involved and so forth. Well, the documents, I understand. It's Rule 1006 of the Federal Rules of Evidence. What I don't understand is why he is, if he was, I'm just not sure, if he was authorized to testify about what the government witnesses had to say to summarize their testimony. Well, under Lemire, there's not a problem with saying what a government witness has said. And I would agree the way the Court made that statement in the record on the 7th of February was unusual, but that he was mainly in this case reviewing documents and so forth. What's the law of the other circuits on summary witnesses? They're most often used in tax cases for some reason. I don't know why. I mean, my understanding is that you are allowed to speak to some degree, and I did not parrot everything that has been said in trial, but remind the jury of what has been said and draw conclusions that are appropriate for a witness rather than the government to make from the evidence that's coming forward. Do Ms. Cooper and Mr. Bryan have appointed counsel? I am not sure. It was Mr. Seligman who was his attorney, and I don't recall whether he was appointed or whether or not he was retained, Your Honor. You see, the government has a tremendous advantage because a special agent of the IRS is not paid by the hour, and it's not paid by anybody except the federal government. On the other hand, for a defense attorney to get somebody to sit as a summary witness in the courtroom for two weeks or three weeks or a month entails an enormous expense. So in that respect, the government is at a tremendous advantage in being able to put on these so-called summary witnesses. Well, I mean, the government certainly used the summary witnesses, but the defense had all the documentation and all the summary charts and so forth well in advance of trial, which was something that was pointed out specifically in trial. And the case law is that it's not problematic to use a summary witness, and that it's – and just because a summary witness ends up being helpful to the government, it does not make it problematic legally. I would point out, too, that in – But they're not limited to – the government uses them in all kinds of cases, it looks like, right? Because – They often do, yes. More was – I know that you draw a distinction between summary and overview, but these witnesses who come in and are talking about evidence at trial, just giving summary-slash-overview testimony about the evidence at trial, because More was a drug and murder case. Lamere was a fraud case. This is a tax case. Correct. But I would say More is very distinguishable in that the agent in that case was testifying as an overview witness, as the first government witness. He had heard no testimony whatsoever. He was not testifying as a summary witness, like here, where Agent LaRose is summarizing evidence that's already come in. Is the distinction ex post versus ex ante? Is that – It's a very serious distinction, yes. And that's the distinction? That's my understanding of the distinction. Whether you come first or whether you come later? Yes, because as a summary witness, you're summarizing evidence that's already come in here, particularly the documentary evidence, leaving the jury to be able to understand the mountain of bank records, tax returns, checks, and so forth, that came in through a variety of witnesses during trial. But I guess I don't see the fundamental distinction as long as, even if you do it ex ante, you testify about things that are, in fact, introduced. I get the danger that if you testify about things that are never introduced, then that's a problem. Right. And this Court, and I believe in the More case, and I'm not sure if there are others as well, has noted that even if you had an overview witness, they ultimately ended up being harmless because the evidence that they talked about that wasn't in yet did ultimately come into trial. And here, that's the same thing. The testimony by Ms. Watkins that came after and by the victim, Mr. Short, that came after, they were both ended up being consistent with what Agent LaRose had testified to ahead of time. And the only reason that happened, really, was because Ms. Watkins' son had gotten ill and they had to call her out of turn. In addition, the statements that were made about purported signatures versus Brian Bryant's signature and so forth, as we've said in our brief, that was all supported by other evidence in trial by the time those statements were made. And none of the conclusions that he made in his testimony were really very controversial. There really wasn't a major question by the time he got on the stand that we were talking about false and fraudulent tax returns and refund checks and so forth. So Brian Bryant's testimony, or Agent LaRose's testimony, was legally fine in this case. And I see that I'm almost out of time, so I'll just quickly go to the loss calculation, if Your Honors would allow me. In that situation, Your Honors, the loss amount is definitely not the amount of the gain. As Mr. Bryant's attorney conceded at sentencing, he was seeking a loss amount of $224,000, which was the amount of checks that were negotiated through bank accounts that Mr. Brian Bryant had used during the scheme. The government amply supported its calculations of the $650,000 loss amount. And I think really the bottom line is that the government supported what it was saying in its calculations through the text of its sentencing memorandum, during its statements at the sentencing itself, and through exhibits that were attached to the government's sentencing memorandum. The only thing that really is perhaps not directly in front of the sentencing court at that time is another spreadsheet that lays out the exact mathematical calculations. For instance, the double counting was removed. The government said they had not double counted amounts and so forth. So there isn't a spreadsheet that shows we took out this check and so forth. But beyond that, everything that was necessary was in front of the district court, and the district court accurately and correctly found a $650,000 loss amount. If the court has no further questions, I would respectfully request that you affirm the judgments of the district court. What does the $4.6 million with respect to Cooper, what does that represent? That represents both the checks that were sent to her house. It represented the checks that were sent to the five addresses that were used to receive tax checks during the scheme, plus the checks that were deposited into scheme bank accounts during her period of participation in the scheme. It's not just the checks that were sent to her address. That's correct. It's not just those checks. Our argument was that it was reasonably foreseeable for her to know, based on her particular actions in the conspiracy,  Is this over a five-year period? No, this was over a, for her particular loss amount, it was from the period of about two and a half years, February 26, 2010, until June 15, 2012. So it was limited to her particular work during the conspiracy, that time period. The time period was limited by her participation, but the amounts weren't limited to her direct involvement. They encompassed anybody who was involved during that time period. Those who were reasonably foreseeable to her, yes. Thank you, Your Honor. Thank you, counsel. Mr. Young, we'll give you two minutes. Thank you, Your Honor. I just want to address one brief point about this distinction between overview and summary witnesses. And I don't think it's necessarily a matter of whether or not the witness testifies at the beginning of a case on day one, or whether or not the witness testifies later in the case. It's about whether or not the witness is testifying about evidence that has not yet been introduced. And Your Honor's point about whether or not it matters if the evidence later comes in, for example, in the instance of Ms. Watkins, matters as well, because we're not talking about two fact witnesses. We're talking about an IRS special agent first introducing the testimony to the jury. And courts have repeatedly said how powerful that testimony is coming from an IRS agent. And Ms. Watkins' testimony was different. She said that Brian Bryant had access to her account. She didn't testify, Brian Bryant controlled my account. Brian Bryant opened my account. She testified as to discrete matters about her account. He had access. He had starter checks. But Agent LaRose had already testified that Brian Bryant controlled her account. So it does matter. It does matter whether the prosecution mentioned that in opening statement? Whether or not Brian Bryant controlled the account? Certainly in closing statements. No, I'm asking about the opening. Yes, Your Honor. My recollection is that the prosecution did, did argue to that fact. But the jury saw it or anticipated that there would be evidence of that, right? Sure. Obviously, there's an important distinction between argument of counsel and the evidence presented, particularly when a court instructs a jury to pay attention to the evidence, not the argument of counsel when they differ. And finally, about the loss amount. This is a really important point, because as the government concedes, the loss amount is based on assumptions and inferences that are not necessarily in the record. We've put a very simple argument to the government, support your math. Support the amount that you picked. And their answer is, well, we have a spreadsheet that isn't in the record, that we didn't present to the district court, and we didn't present to Brian Bryant, but trust us that we've removed double-counted claims, and trust us that we're relying on accounts of co-conspirators to come up with our loss amount, even though those accounts were opened outside of the period that Brian Bryant was alleged to have participated in the conspiracy. So it's just, it's a trust us, it's a trust us argument that when we're talking about years on a sentence, it should matter. The court should be very concerned about that. So in conclusion, we would ask that the district court should have granted a mistrial for IRS Special Agent LaRose's improper summary testimony, and that the loss amount was arbitrarily calculated. Thank you, Your Honors. Thank you. Mr. Hart, we'll give you two minutes as well. Thank you, Your Honor. In response to Judge Randolph's question, Ms. Cooper was represented by appointed counsel, and I mention that because, trial, and I mention that because I've been here a few years, and I've never seen a request for a defense expert to sit in, and the reason for that is because everyone knows no district court would ever grant that voucher. So I think the court is correct that it does present an imbalance. The second point I'd like to make is about loss. Although we did not raise this in our initial argument, the government did in response to questions. I have read the loss calculation by the government several times. I do not understand it. If the court reads it, understands it, and considers it reasonable, then we lose this argument. But I wish to point out that we did list the loss based on Agent LaRose's charts in our brief, and we came to the arithmetic conclusion, not the possibilities of loss. But as we point out in our brief, there were 235 checks sent to her address, 214 were cash, but that amounted to a loss in the neighborhood of $500,000, not the amount that the government. Now, the government says, well, we included all the addresses. No evidence that Ms. Cooper ever knew about all the addresses. But we have to base her loss based on reasonable foreseeability. Finally, I want to challenge the government's argument in their brief that even if the suppression motion. Kagan on reasonable foreseeability, you don't do you take issue with the proposition that even if the checks weren't associated with her particular address, it still could be reasonably foreseeable that checks would be associated with a different address? It could be if there were evidence of that. If she knew that other people received the checks. If there were evidence at trial that she knew that. There is not. Finally, I say my time is up, and I wish to submit. Thank you. Roberts. Thank you, Mr. Hart. Thank you, counsel. Mr. Young and Mr. Hart, you are appointed by the Court to represent the appellants in this case, and the Court appreciates your assistance.
judges: Srinivasan, Rao, Randolph